490 S.E.2d 806

**Lelah Ruth ADKINS and Bruce W. Adkins, Plaintiffs Below, Appellants,**

v.

**John A. HUNT, M.D.; Vincent Grant, M.D.; K.V. Raman, M.D.; Cabell Huntington Hospital, Inc., a West Virginia Statutory Corporation; and Huntington Vascular Surgery, Inc., a West Virginia Medical Corp., Defendants Below, Appellees.**

No. 23670.

Supreme Court of Appeals of West Virginia.

Submitted April 22, 1997.

Decided July 15, 1997.

---

Gerald R. Lacy, Charleston, for Appellants.

Thomas L. Craig, David Reid Dillon, Bailes, Craig & Yon, Huntington, for Appellee Cabell Huntington Hospital, Inc.

PER CURIAM:

Appellants Lelah Ruth Adkins and her husband, Bruce W. Adkins, plaintiffs below, appeal a jury verdict in favor of Cabell Huntington Hospital, Inc., defendant below, in an action for medical malpractice. The Adkinses contend, along with various other assigned errors, that the Circuit Court of Cabell County erred by refusing to give instructions stating that Cabell Huntington Hospital, Inc., had a non-delegable duty to establish guide-

lines for the supervision of resident physicians treating patients in its facility. We find that the circuit court did not err in refusing the Adkinses' instructions.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On the night of November 18, 1992, Lelah Ruth Adkins sought medical care at Cabell Huntington Hospital's Emergency Room. Mrs. Adkins was initially assigned to receive treatment from Dr. John A. Hunt. However, shortly after Mrs. Adkins was admitted, Dr. K.V. Raman became her attending physician and, thus, became responsible for her care. Although Dr. Raman was responsible for Mrs. Adkins's care, the medical treatment she received was carried out primarily by Dr. V. Grant, a first-year resident.[1] Dr. Grant's treatment of Mrs. Adkins was delivered under the supervision of Dr. Raman.[2] Mrs. Adkins was discharged from Cabell Huntington Hospital [hereinafter "Cabell Huntington"] on November 21, 1992. On the day following her discharge from the hospital, Mrs. Adkins suffered a stroke. The Adkinses contend that negligent treatment Mrs. Adkins received while admitted to Cabell Huntington caused her stroke.

In 1992, when the events in question occurred, Dr. Raman was employed by Marshall University as a clinical professor of surgery. He also engaged in private practice through his employment with Huntington Vascular Surgery, Inc., and he had staff privileges at area hospitals including Cabell Huntington.

Dr. Grant, along with other resident physicians, was permitted to participate in the treatment of patients at Cabell Huntington by virtue of an affiliation agreement between Marshall University School of Medicine and John Marshall Medical Services, Inc. [herein-

after collectively referred to as "Marshall"], and Cabell Huntington. The affiliation agreement contained clauses which stated:

2. Marshall shall be solely and exclusively responsible for the acts and omissions of the students and residents who will be permitted to work on the Hospital premises pursuant to this Agreement.

It is agreed and understood that the Hospital shall not exercise any control or have the right to control the professional medical decisions of the students and residents. Marshall shall make arrangements with independent attending physicians to manage and educate residents in their day-to-day activities.

. . . .

9. Marshall shall be responsible for appointing clinical faculty who shall provide instruction and supervision for the students and residents. Marshall and the Hospital shall agree on the minimum number of clinical faculty necessary to ensure adequate supervision of students and residents. The clinical faculty shall seek and obtain appointment on the Hospital's medical staff with appropriate clinical privileges. The clinical faculty shall not supervise students or residents in any treatment modalities or procedures for which the clinical faculty lacks clinical privileges at the Hospital.

On April 20, 1994, Mrs. Adkins and her husband filed the instant law suit against Dr. Hunt, Dr. Grant, Dr. Raman, Cabell Huntington, and Huntington Vascular Surgery, Inc. Thereafter, Dr. Hunt was voluntarily dismissed from the action by the Adkinses. Defendants Dr. Raman, Huntington Vascular Surgery, Inc., and Dr. Grant were dismissed with prejudice after Drs. Raman and Grant reached a compromise and settlement with Mr. and Mrs. Adkins.

1. We use the term "resident" or "resident physician" to refer to physicians who have graduated from medical school and are engaged in at least their second year of post-graduate clinical training. *See Mosby's Medical and Nursing Dictionary* 981 (2d ed.1986). Physicians in their first year of post-graduate clinical training are commonly referred to as interns. *See Mosby's* at 593.

2. Apparently, the attending physician assigned to each patient is responsible for supervising any treatment to that patient provided by resident physicians. Generally, residents also receive guidance from more senior residents.

The Adkinses then proceeded to trial against Cabell Huntington, the only remaining defendant, on the theory that the hospital was independently negligent in failing to have in place an appropriate mechanism for supervising resident physicians. At trial the Adkinses presented a portion of Cabell Huntington's By-laws, which provided:

Article VII, Section 4: Special Privileges: Physicians in Training

Subsection 1: Resident physicians may function within the Hospital for educational purposes as assigned under the supervision of members of the Medical Staff. Their qualifications regarding educational background, experience, medical licensure, when applicable, and other pertinent features shall be in the same manner as those of any other physicians. Their privileges shall be limited to those of their supervising physicians. Orders written by resident physicians who have been approved by the Credentials Committee shall not require cosignature by the supervising physician. The cosignature of the supervising physician will be required on the face sheet, History and Physical, Consultation Report, Operative Report, Discharge Summary and procedure noted when documented by a resident physician.

The Adkinses submitted that this provision, which they contended was the only provision in Cabell Huntington's by-laws, rules and regulations pertaining to the supervision of residents, was insufficient to meet the hospital's duty of care to its patients and, thus, amounted to negligence on the part of the hospital.

Over the Adkinses' objection, Cabell Huntington entered into evidence a copy of the affiliation agreement between the hospital and Marshall. Cabell Huntington argued that pursuant to the agreement, Marshall was responsible for the supervision of the residents.

After hearing all the evidence, the jury returned a verdict in favor of Cabell Huntington. Mr. and Mrs. Adkins filed a motion for a new trial or for judgment notwithstanding the verdict, which was denied by the April 6, 1995, order of the Circuit Court of Cabell County. It is from this order that the Adkinses now appeal.

## II.

## DISCUSSION

### A.

### Standard of Review

The Adkinses contend that the circuit court erred in refusing to give certain instructions they offered. We have held that:

"' " 'Instructions must be read as a whole, and if, when so read, it is apparent they could not have misled the jury, the verdict will not be disturbed, through [sic] one of said instructions which is not a binding instruction may have been susceptible of a doubtful construction while standing alone.' Syl. Pt. 3, *Lambert v. Great Atlantic & Pacific Tea Company*, 155 W.Va. 397, 184 S.E.2d 118 (1971)." Syllabus Point 2, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986).' Syllabus Point 3, *Lenox v. McCauley*, 188 W.Va. 203, 423 S.E.2d 606 (1992)." Syl. Pt. 6, *Michael v. Sabado*, 192 W.Va. 585, 453 S.E.2d 419 (1994).

Syl. pt. 7, *Parham v. Horace Mann Ins. Co.*, 200 W.Va. 609, 490 S.E.2d 696 (1997). Moreover, "[w]hether an instruction is legally correct is a question of law and our review is *de novo*. *State v. Guthrie*, 194 W.Va. 657, 671 n. 12, 461 S.E.2d 163, 177 n. 12 (1995)." *B.F. Specialty Co. v. Charles M. Sledd Co.*, 197 W.Va. 463, 466, 475 S.E.2d 555, 558 (1996). Finally, we note that "[o]ur appellate review of a trial court's refusal to give a requested instruction is deferential." *B.F. Specialty Co.* at 466, 475 S.E.2d at 558. With these principles in mind, we proceed to consider the instructions offered by the Adkins'.

### B.

### Jury Instructions

The Adkinses complain that the trial court erred in refusing to give Plaintiffs'

Instruction No. 2 [3] and Plaintiffs' Instruction No. 2A,[4] which would have informed the jury that the Hospital had a non-delegable duty to exercise reasonable care for the safety of its patients through proper supervision of resident physicians.[5] The circuit court refused these instructions on the ground that they were unsupported by West Virginia law.

The Adkinses urge us to find that hospitals owe the non-delegable duty to provide for such supervision. They argue that this Court's holding in *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991), is instructive in resolving this issue.[6] More specifically, the Adkinses contend that because *Torrence* mandates that Dr. Grant be treated as an agent of the hospital for purposes of vicarious liability,[7] then similarly, the hospital should have a duty to assure that Dr. Grant was adequately supervised. Furthermore, the Adkinses argue that the affiliation agreement between Cabell Huntington and Marshall is insufficient to satisfy this duty because it did not set forth standards for supervision. Finally, the Adkinses contend that the Restatement (Second) of Torts,

3. Plaintiffs' Instruction No. 2 stated:

The Court instructs the jury that the defendant hospital under the circumstances shown by the evidence had a non-delegable duty to exercise reasonable care for the safety of its patients through proper supervision of its residents caring for its patients.

Therefore, if you find by a preponderance of the evidence that the means employed by the hospital to provide supervision of its residents was [sic] not reasonably adequate and, as a result, improper care was rendered to the plaintiff Lelah Ruth Adkins by the defendant hospital's resident, then you may find that the defendant hospital deviated from the acceptable standard of care. If you further find that the deviation from the acceptable standard of care, if any, increased the risk of plaintiff Lelah Ruth Adkins suffering a stroke, then you may find that such deviation was a substantial factor in causing the harm to the plaintiff as shown by the evidence [sic] and if you so find your verdict shall be for the plaintiffs and against the hospital.

4. Plaintiffs' Instruction No. 2A stated:

The Court instructs the jury that the defendant hospital under the circumstances shown by the evidence had a non-delegable duty to exercise reasonable care for the safety of its patients through proper supervision of its residents caring for its patients.

Therefore, if you find by a preponderance of the evidence that the means employed by the hospital to provide supervision of its residents was [sic] not reasonably adequate and, as a result, improper care was rendered to the plaintiff Lelah Ruth Adkins by the defendant hospital's resident, then you may find that the defendant hospital deviated from the acceptable standard of care.

5. The Adkinses also assigned error to the circuit court's refusal of Plaintiffs' Instruction No. 6, which would have instructed the jury that it could find Cabell Huntington was negligent in granting residents the same hospital privileges as staff physicians, and further erred in giving various instructions offered by Cabell Huntington, and in receiving into evidence the affiliation agreement between Cabell Huntington and Marshall. Because we find these issues were inadequately briefed by the Adkinses, we will not address them on appeal. *See Ohio Cellular RSA Ltd. Partnership v. Board of Pub. Works*, 198 W.Va. 416, 424 n. 11, 481 S.E.2d 722, 730 n. 11 (1996). *See also State v. Flint*, 171 W.Va. 676, 679 n. 1, 301 S.E.2d 765, 768 n. 1 (1983); *Addair v. Bryant*, 168 W.Va. 306, 320, 284 S.E.2d 374, 385 (1981). Finally, the Adkinses contend that the court erred in submitting the jury verdict form to the jury over the Adkinses' objection that the form permitted apportionment of fault between Cabell Huntington, Dr. Grant and Dr. Raman. However, the jury did not reach that portion of the jury verdict form because it found that Cabell Huntington was not negligent. Consequently, we find this error is without merit.

6. In *Torrence* we held:

Where a hospital makes emergency room treatment available to serve the public as an integral part of its facilities, the hospital is estopped to deny that the physicians and other medical personnel on duty providing treatment are its agents. Regardless of any contractual arrangements with so-called independent contractors, the hospital is liable to the injured patient for acts of malpractice committed in its emergency room, [sic] so long as the requisite proximate cause and damages are present.

Syl. pt. 1, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991). The Adkinses explain that they did not proceed against the hospital on an agency theory because the "agents," Drs. Grant and Raman, had reached settlement agreements with the Adkinses. Because the Adkinses sued on the theory that Cabell Huntington was independently negligent, *Torrence* did not apply.

7. Vicarious liability is defined as:

The imposition of liability on one person for the actionable conduct of another, based solely on a relationship between the two persons. Indirect or imputed legal responsibility for acts of another; for example, the liability of an employer for the acts of an employee, or, a principal for torts and contracts of an agent. *Black's Law Dictionary* 1566 (6th ed.1990).

§ 427 supports their argument.[8]

We have thoroughly reviewed the record in this case and we find that the instructions proposed by the Adkinses were appropriately rejected by the trial court. On the issue of the non-delegable duty, the two proposed instructions [9] stated, without more, that the hospital had a "non-delegable duty to exercise reasonable care for the safety of its patients through proper supervision of its residents caring for its patients." The Adkinses' instructions did not further define what is meant by a non-delegable duty. Thus, even if we were to conclude that such a theory existed in this jurisdiction, which we do not decide in this case saving this intriguing issue for another day, the instruction fails to define the legal theory advocated by the Adkinses. The term "non-delegable duty" is a legal term which entails more than the common meaning of the words contained therein. A jury could not be expected to comprehend the full meaning of this complex term without guidance. Neither of the Adkinses' two proposed instructions defined "non-delegable duty." Additionally, there were no supplemental instructions attempting to provide guidance to the jury in applying this legal theory.

■ As we have held "[a]n instruction which is incomplete and which tends to mislead the jury is erroneous and should be refused." Syl. pt. 3, *Kendall v. Allen*, 148 W.Va. 666, 137 S.E.2d 250 (1964). In this vein, we have explained that

"if an instruction does not correctly expound the law, the court, as a general rule, may refuse to give it and is not bound to modify it or give any other instruction in its place." It is further dealt with in 10 Michie's Jurisprudence, Instructions, § 9,

in the following words: "The court, having to keep careful watch and guidance over all the many details of the trial as it goes on, is not bound to take each improper instruction, and so remodel it as to make it good law, nor in lieu thereof to instruct generally on the law of the case, though it might do so if asked."

*Brown v. Crozer Coal & Land Co.*, 144 W.Va. 296, 307, 107 S.E.2d 777, 785 (1959) (quoting 10 Michie's Jur., *Instructions*, §§ 6 & 9). *See also* Syl. pt. 19, *Rodgers v. Rodgers*, 184 W.Va. 82, 399 S.E.2d 664 (1990) (" 'It is reversible error to give an instruction which tends to mislead and confuse the jury.' " (quoting Syllabus Point 5, *Sydenstricker v. Vannoy*, 151 W.Va. 177, 150 S.E.2d 905 (1966))); *State v. Miller*, 197 W.Va. 588, 607, 476 S.E.2d 535, 554 (1996) (explaining that "a jury instruction is erroneous if it has a reasonable potential to mislead the jury as to the correct legal principle or does not adequately inform the jury on the law"). Therefore, the instructions proposed by the Adkinses would not have been proper even assuming that the theory that a hospital has a non-delegable duty to provide for the supervision of resident physicians was established as the law of this state.

Moreover, after stating abstractly that Cabell Huntington had a non-delegable duty to provide supervision to resident physicians, the two proposed instructions at issue proceeded to explain that the jury could return a verdict in favor of the Adkinses if it concluded, by a preponderance of the evidence, that the hospital failed to exercise the acceptable standard of care in providing for such supervision. Except for the inclusion of the undefined term "non-delegable duty" in the first portion of the instruction, there is no substantive difference between the instructions

8. The section of the Restatement relied upon by the Adkinses involves an inherently dangerous activity exception to the general rule of employer non-liability for the negligent acts of an independent contractor. The Restatement provides:

§ 427. Negligence as to Danger Inherent in the Work. One who employs an independent contractor to do work involving a special danger to others which the employer knows or has

reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

Restatement (Second) of Torts, § 427 (1965).

9. *See supra* notes 3 and 4.

proposed by the Adkinses and the instructions that were ultimately given to the jury.[10]

■ We have held that " '[i]t is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court.' Syl. pt. 20, *State v. Hamric,* 151 W.Va. 1, 151 S.E.2d 252 (1966)." Syl. pt. 4, *State v. Armstrong,* 179 W.Va. 435, 369 S.E.2d 870 (1988). *See also State v. Derr,* 192 W.Va. 165, 179, 451 S.E.2d 731, 745 (1994). For the foregoing reasons, we find that the trial court properly refused Plaintiff's Instructions 2 and 2A.

## III.

## CONCLUSION

We find that the instructions proposed by the Adkinses were incomplete and tended to be misleading. Furthermore, the substantive content of the proposed instructions was adequately covered by other instructions given by the trial court. Consequently, we af-

---

firm the April 6, 1995, order of the Circuit Court of Cabell County.

Affirmed.

---

10. The following instructions on the hospital's duty, also proposed by the Adkins, were read to the jury:

PLAINTIFFS' INSTRUCTION NO. 1

A hospital owes to its patients a duty to have the rules, regulations and policies in which specify the mechanism in place to review, monitor and supervise the care and treatment administered within its facility by resident physicians. If you find from the evidence that the defendant hospital, in the performance of this duty, deviated from the standards of care required of it, as to which you have been instructed and that the injury to the patient resulted from such breach of duty, you may find the hospital liable.

PLAINTIFFS' INSTRUCTION NO. 3

The Court instructs the jury that a hospital such as Cabell Huntington Hospital has a duty to its patients to exercise reasonable care to see to it that the patients receive proper care. Included in such duty is the duty to have proper and adequate rules and regulations regarding the care of patients. The failure to do so is negligence.

PLAINTIFFS' INSTRUCTION NO. 4

The standards of care for the treatment of patients by both doctors and hospitals have been established by the medical and health care professionals themselves.

They are not statements of high ideals to be reached for by doctors or hospitals.

Rather, they are minimum standards set by these professionals themselves to assure that the treatment given patients by both doctors and

hospital employees meets such standards at the least.

PLAINTIFFS' INSTRUCTION NO. 5

The Court instructs the jury that where a hospital permits physicians in training, such as residents, to care for its patients the hospital in the exercise of reasonable care is required to have written rules, regulations and policies controlling how staff physicians supervise physicians in training. The failure to do so is negligence.

PLAINTIFFS' INSTRUCTION NO. 8

Defendant Cabell Huntington. Hospital had a legal duty to exercise that degree of care, skill and learning required of a hospital in the same class under similar circumstances. Therefore, if you believe that hospitals complying with national standards as to the quality of health care in November 1992, required the existence of a hospital policy requiring resident physicians to consult with the attending physician before writing orders for patents; and. [sic]

If you further find by a preponderance of the evidence that Defendant Cabell Huntington Hospital had no such policy and if you also determine that the discharge orders for Plaintiff Ruth Adkins were written by a resident physician without the permission or supervision of the attending physician and those orders resulted in Plaintiff Ruth Adkins being discharged from the hospital with an increased risk of suffering a stroke, you may return your verdict for the Plaintiffs and against the Defendant.

Then you may conclude that the Defendant hospital did not satisfy this standard of care.